## CLIFTON *v.* DAVIS.

A court of equity will set aside a voluntary deed on the application of the grantor, executed while labouring under a deprivation of intellect, the result of excessive intoxication: where no purchaser for a valuable consideration can be affected thereby, and where the deed has prejudiced no one but the grantor himself.

A man may allege his own incompetency to avoid his deed, on the ground of insanity or drunkenness, when such intemperance produces a deprivation of reason and understanding. And the absence of reason for a deliberate consent applies to both conditions. When drunkenness goes so far as absolutely to destroy the reason, it renders a person in this state, so long as it continues, incapable of contracting, since it renders him incapable of consent.

*Oct.* 1. THIS was a bill in equity, setting forth that Thomas Clifton, the plaintiff, entertaining a wish to visit England, his native country, and being desirous to make some arrangement for the protection of his property during his absence, and for the proper mode of so doing, applied to Davis, the defendant, for his advice as to the means by which it could be effected. That said Davis recommended that the plaintiff should apply to a lawyer, since dead, and whom he did not know, who, Davis stated, would prepare for the plaintiff the proper power of attorney, to him, the said Davis, to manage the property of the plaintiff during his contemplated absence from the United States, and that he gave him a paper, as he understood, as instructions to the lawyer to prepare such a power of attorney; that shortly after, the complainant called upon the lawyer at his office, and stated to him the object of his calling, which was to have a power of attorney prepared, and gave him some paper, and expressed to him a desire he had, that his wife and two daughters she had by a former husband should not be put to trouble during his absence, but be assisted in any business by said Davis, and wished to know of the lawyer when he might call for the power he wished drawn; that the attorney took down the names of his wife and her daughters, and told him the paper would be ready the next morning; that he called the next day and re-

ceived from the attorney the paper which he had prepared, and which he understood, from the manner in which it was read over to him by the lawyer, to be a power of attorney such as he desired to be drawn; that he then left the office, and tried to read the paper, but could not, the handwriting being difficult to read; but he supposed his object had been made known to the attorney, and he himself was ignorant how such a power should be drawn, and as the paper appeared to be of some length, and having confidence in the knowledge of the lawyer, he supposed everything had been prepared according to his instructions and wishes, and that he might safely execute it in the manner pointed out by the lawyer; and he accordingly did, and acknowledged it before an alderman on the same day that he received it; that when the paper was recorded it was not delivered to said Davis, but was received by the complainant from the recorder.

That circumstances, some time after the execution of the paper, induced him to relinquish his intended journey to England, and he was advised to have said paper examined, to see if any revocation of the power was necessary, when he was told by the person who examined the record of it, that it appeared to be a conveyance in trust of all his property, and not a power of attorney, the original having been taken from the complainant during a fit of illness, with which he was afflicted.

A copy of the paper was inserted in the bill, which appeared to be an absolute conveyance of all the plaintiff's property to Davis, in trust, to pay his debts, and to pay over to Clifton two-thirds of the net rent, interest, and income of the estate, or so much as the said Davis should think necessary, and the rest and residue to his two stepdaughters, and, on the death of Clifton, to convey the whole estate to them.

The answer admitted that the complainant called upon him for advice, but expressly declared that Clifton desired Davis to become his trustee, and that he refused, but recommended the name of another gentleman, to act for the complainant, who was his friend. It was admitted in the answer that Davis gave him a paper, and advised him to call upon the attorney who drew the deed. And the paper was produced, which was signed by Clifton, and was drawn by Davis at the request of Clifton, and written in his presence. The paper contained a request that a deed of trust should be drawn to Davis of all the complainant's estate, and in the manner stated in the deed.

A memorandum, in the handwriting of the lawyer who drew the deed, was found among his papers after his death, containing instructions, which appeared to have been taken down by him from Clifton, when at his office, corresponding with the trusts in the deed; also the names of the stepdaughters. The answer further stated that the defendant went to the office of the lawyer with Clifton, when the request was made for the drawing of the deed, but did not see the complainant for many days after, as the defendant was absent from the city.

The answer also stated, that the complainant, previous to the execution of the deed (which was on the 27th of July, 1838), was affected at intervals with aberration of mind, occasioned by excessive drinking, as the respondent believed, and that he believed on the morning of said 27th July, when Clifton called upon him, Clifton was not himself, did not know what he was doing, although he did not appear to be under the immediate influence of liquor, and did state what he desired in relation to having a deed of trust drawn; and, to one unacquainted with his habits, was evidently under the effects of excessive indulgence, which with the complainant produces an unsound state of mind. It was also stated by the respondent in his answer, that he did not believe the complainant, at the *time* of giving said instructions, or of executing said deed, was in his usual sound state of mind, as when not affected by liquor or its effects, but was under an aberration of mind and labouring under delusion, and on that account and other reasons he determined not to be a trustee.

The defendant further set forth in his answer, that some time in the year 1838, after he returned to the city, he received the deed, but from whom he does not recollect. The answer further stated, that he had not taken possession of the personal or real estate of said Clifton.

The answer also admitted that Clifton had been confined in the Alms House when labouring under an unsound state of mind from the effects of excessive drinking. The answer denied the statements in the bill about the intended visit of Clifton to England, or that he applied to him for advice as to the proper mode of protecting his property during his absence, or that he recommended that he should apply to the lawyer who drew the deed, and that he would prepare a power of attorney; and generally all the facts as to a deed being drawn instead of a power of attorney, as charged in the bill.

The stepdaughters were made parties to the bill, and appeared

by guardian, who answered that they were ignorant of all things contained in the bill.

The cause was argued by Messrs. *G. M. Wharton* and *Edward D. Ingraham*, for complainants, and *John M. Read*, for respondents.

It was argued by plaintiff's counsel, that it is now settled at law that a man may allege his own incompetency to avoid his deed: 5 Whart. 371. That it was always the doctrine in Equity: 1 Story's Equity, 229, 31. While insanity might not excuse one from civil responsibility for acts prejudicial to others, the rule did not hold as to acts prejudicial to himself: Story, 231; Fonb. Eq. § 2, p. 967. Drunkenness is on the same footing with lunacy: Bull. N. P. 168, 172; Fonb. 67; 1 Hen. & Munf. 70; 5 Barn. & Cress. 170; 1 Wood & Walker, 105, 6; 3 Camp. 125. And whenever, from the nature of the transaction, there is not good faith, or the contract or act is not just in itself, nor for the benefit of the party, in such cases a Court of Equity will set the deed aside: 1 Story's Eq. 232; 7 Dowl. & R. 614; 7 Vesey, 264. The exception is for mere necessaries.

Voluntary conveyances, although good between the parties, when the grantor is under no incapacity to act, yet the claim in Equity is not countenanced when the persons benefited are mere volunteers and strangers in blood, and have expended no money or labour, and when the grantor was under no obligation to support or provide for them: 2 Mylne & Keen, 493, 503; 2 Pr. Wm. 203; 2 Vesey, 627; 2 Atk. 324.

Courts of Equity will go to a considerable extent to relieve from a contract in case of drunkenness: 1 Story's Equity, 235; 18 Vesey, 12; 1 Vesey and Beames, 195; 1 Smith & Batty, 183, 454; 3 Blight, N. S. 1; 1 Dev. 380.

The opinion of the Court was delivered by

KING, President.—The facts disclosed in the bill and answer render it quite apparent, that when Thomas Clifton, on the 28th day of July, 1838, executed the deed to Armon Davis, which it is the object of this proceeding to set aside, he was in a state of temporary insanity, induced by habits of excessive intoxication. His does not seem to have been then the condition of mere intoxication, but of a morbid and depraved intellect, induced by the habitual and excessive use of ardent spirits. The defendant Davis, in his answer, admits his belief, that when the plaintiff gave his directions for the preparation of the deed, by which he was to divest himself of all his

property, he did not know what he was doing. Davis appears to have reluctantly yielded to the acceptance of the trust, in order to get rid of the importunity of the plaintiff, at the same time being satisfied that he was "under an aberration of mind, and labouring under delusion." Mr. Davis is a man of unquestionable character, and there is no reason to believe or suspect that any collusion exists between the parties, in order to avoid the operation of the deed. The deed, on the face of it, presents a suspicious aspect. It grants to Davis, in trust, all the property, real, personal, and mixed, of the plaintiff, first to pay his debts, then to pay him, during life, out of the net income, for his support, a sum not exceeding two-thirds; the balance of income to be paid over to his two minor stepdaughters, Elizabeth and Mary Ann Walters; and after his death the principal of the estate to them as tenants in common. At this time Clifton had a wife, the mother of Elizabeth and Mary Ann, who is left utterly unprovided for by the settlement, was in a good business, and is described by the answer of Davis as an industrious man, prudent and careful in his dealings, except when under the influence of his besetting infirmity. Now, the effect of this settlement, if carried literally out, would have been to close his business, to leave his wife destitute, and to confine himself to a mere subsistence, not to exceed two-thirds of the net income of his estate. The provision for himself does not seem to have been in the contemplation of Clifton; for Davis, in his answer, says that the suggestion came from him, and was adopted by Clifton. A more unjust, absurd, and indiscreet disposition of property could hardly be imagined, and so Davis, the trustee, appears to have regarded it. For up to this time he never has taken possession of any part of the transferred property, but left it in the possession of the plaintiff and his family. An illustration of Clifton's capacity to make such a sweeping disposition of his property is disclosed in the fact that, in a short time after the date of the deed to Davis, he is found in the Philadelphia Alms House, under treatment as an insane patient. It would seem from the bill that Clifton now supposes that the instrument intended to be signed by him, was a power of attorney to Mr. Davis, preparatory to a journey which he (Clifton) intended to make to his native country, England. This idea is not sustained by the answer, in which Mr. Davis describes the settlement as being desired by Clifton, in consequence of a contemplated visit to New Orleans. Both these

journeys were, it would seem, the mere phantasies of a mind thrown from its balance by intemperance.

The question for decision is, whether a Court of Equity will set aside a voluntary deed on the *application of the grantor*, executed while labouring under a deprivation of intellect, the result of excessive drinking, where no purchaser for valuable consideration can be affected by it; and where the deed has prejudiced no one but the grantor himself. And on this question we are clearly of opinion in favour of the plaintiff. The doctrine of the common lawyers that no party could be admitted to disable or stultify himself, has ceased to be the reproach of a system, whose claim to the perfection of reason could not but be equivocal while such a moral anomaly retained its place as a fundamental principle. And it is now established both at law and in equity, that a man may allege his own incompetency to avoid his deed; in other words stultify himself: Bensell *v.* Chancellor, 5 Whart. 371; Story on Equity, 229, 30, 31; 1 Fonb. Eq. B. 1, ch. 2, § 2. Drunkenness rests on the same footing with insanity, where the extent of the former is such as to induce the deprivation of reason and understanding, and consequently of any serious and deliberate consent: Ib. Fonb. 618. In Cooke *v.* Clayton, 18 Vés. 12, Sir William Grant observes, " as to that extreme state of intoxication that deprives a man of his reason, I apprehend that even at law it would invalidate a deed obtained from him while in that condition :" 1 Story Eq. 285. The absence of capacity for any deliberate consent, alike applies to both conditions, and in both furnishes the reasons for the invalidity of the contracts of lunatics, and the helpless, stolid, and stupified drunkard. This is also the doctrine of the civilians. " It is evident" (says Pothier, P. C. Art. 4, § 49) " that drunkenness, when it goes so far as absolutely to destroy the reason, renders a person in this state, so long as it continues, incapable of contracting, since it renders him incapable of consent." But the present is even a stronger case than one of mere excessive and disqualifying drunkenness. It is the case in which the continuous and excessive use of intoxicating drinks had so depraved the intellectual faculties, as to impair all the powers of judgment, memory, and reflection ; leaving, after the excitement of the stimulant had passed away, the mind a confused and disorganized wreck. On the whole case disclosed in the pleadings, the Court are of opinion the deed of July 1838 must be set aside and the plaintiff must have the relief prayed for in his bill.